UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WADE WUDTKE,

               Plaintiff,

      v.                                   Case No. 16-C-260

ADAM BIEBER,
SHAWANO COUNTY,
DEBORAH NOFFKE,
JERRY ERDMANN,
BONNIE OLSON,
GENE HOPPE, and
WILLIAM SWITALLA,

               Defendants.

## DECISION AND ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Wade Wutdtke, a former deputy sheriff of the Shawano County Sheriff's Office, filed a complaint alleging claims under 42 U.S.C. § 1983 against Shawano County Sheriff Adam Bieber as well as Deborah Noffke, Jerry Erdmann, Bonnie Olson, Gene Hoppe, and William Switalla, members of the Shawano County Administrative and Insurance Committee (the Committee defendants). He also asserts state law claims against Bieber, the Committee defendants, and Shawano County. Arising under federal law, the § 1983 claims provide this court with jurisdiction under 28 U.S.C. § 1331. The court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The defendants have filed a motion seeking summary judgment on all of Wudtke's claims. Wudtke has filed a motion for leave to file a sur-reply in opposition to the defendants' motion for summary judgment. For the following reasons, Wudtke's motion for leave

to file a sur-reply will be granted and the defendants' motion will be granted-in-part and denied-in-part.

## BACKGROUND

Wudtke was employed as a deputy sheriff for the Shawano County Sheriff's Office from January 1999 to March 19, 2015. He served in the capacity as a detective from December 2007 until March 2015. The Sheriff's Office employed six detectives: Wudtke, Richard Wright, Chris Gamm, Troy Ugoretz, Keith Sorlie, and Sergeant Detective Gordon Kowaleski. In 2014, the position for Sheriff of Shawano County was up for re-election. Adam Bieber opposed the incumbent, Randall Wright, in the primary election for Republican candidate. Bieber had been employed as a police officer by the City of Shawano Police Department for approximately 11 years.

On July 22, 2014, a picnic was held in Wescott, Wisconsin to allow the Republican sheriff candidates, Sheriff Wright and Bieber, to give campaign speeches. Wudtke attended the picnic with fellow detectives Gamm and Wright and recorded the speeches with his camera. Although Sheriff Wright took questions during his speech, Bieber indicated that he would be available to address any questions after the speeches. Bieber returned to his family's picnic table, and Detectives Wudtke, Wright, and Gamm approached him to discuss his campaign position. Wudtke intended to audio-record this conversation. Specifically, Wudtke inquired as to where Bieber obtained his ten years of experience as a drug officer, why he opposed purchasing a Mine-Resistant Ambush Protected Vehicle (MRAP), and why he stated the Sheriff's Office had performed an unlawful search of County Board member Noffke's residence. These discussions also included comments from Detective Wright, Detective Gamm, Sheriff Wright's wife, and District Attorney Greg Parker.

2

The parties left the picnic with varying perspectives as to what occurred during the conversation. That evening, Bieber published the following statement on his "Bieber for Sheriff" Facebook page:

> Had a great time at the picnic tonight...up until my family and I were surrounded by three county detectives and the Sheriff's wife...at least they stopped bad mouthing me when my son started crying.

(ECF No. 24-1 at 47.) On the same night, Wudtke responded to Bieber's post on his own Facebook page:

> It is interesting that Mr. Bieber would say the detectives "surrounded" him and were "bad mouthing" him in front of his children, that caused his children to cry. I seem to remember it a bit differently. My video camera, that I had also remembers that the detectives were keeping level voices and simply asking a few professional questions, when Bieber became very flustered and immediately challenged the detectives to 'whip out our d!*ks and measure them' in front of his own children.... The Sheriff's wife did come up to Bieber and simply told him that she would pray for him, after the "whip out" comment. It is extremely unfortunate that Biebers [sic] children had to hear their Father make those comments and raise his voice, like he did. There was no "surrounding" or "bad mouthing." There were no unlandished [sic] questions asked, only very unprofessional answers given on Biebers [sic] behalf. Just remember that just because a video camera isn't pointing at you doesn't mean that it is not recording. It is extremely disappointing that the public has to resort to videotaping a candidate to make sure that they are not speaking untruths. That type of politics is cancer. We all pray for you Mr. Bieber.

(ECF No. 25-1.) A few days later, Wudtke published two additional Facebook posts campaigning against Bieber. (ECF No. 25-2.) Wudtke contends that his conversations at the picnic and his Facebook posts constitute speech on matters of public concern and deserve First Amendment protection.

After the picnic, County Board Supervisor Erdmann received reports from Marcus Jesse, an individual who had attended the picnic but did not actually witness the discussions, and Noffke that there had been a confrontation between Bieber and the detectives. Erdmann attempted to

3

corroborate these reports with DA Parker who had been involved with some of the conversations at the picnic. Although DA Parker did not see the beginning of the discussions, he had also received information that a confrontation had occurred. Erdmann believed the detectives' actions were confrontational. Accordingly, at the August 6, 2014 public safety meeting, he recommended that Sheriff Wright investigate the detectives' picnic-related conduct. Sheriff Wright concluded he would not authorize an investigation, indicating that no citizen complaint form had been filed and the detectives were off duty during the picnic.

At a closed Administrative and Insurance Committee meeting held by the Shawano County Board of Supervisors on August 19, 2014, Erdmann shared his concerns regarding the alleged confrontation. Although committee member Noffke did not participate in the discussions relating to the picnic because of the Sheriff's Office's investigation of her, she did participate in the Committee's ultimate vote. All five committee members—Erdmann, Noffke, Hoppe, Switalla, and Olson—voted to retain Attorney Dan Borowski to investigate the events at the picnic. The purpose of the investigation was to determine whether the detectives were off-duty while attending the picnic, whether they used their positions of authority to intimidate or harass Bieber, whether Sheriff Wright had directed them to confront Bieber, whether they used county equipment during the picnic, and whether the conversations about the Noffke search warrant with DA Parker violated department policies prohibiting deputies from discussing information regarding criminal cases outside the department. (Defs.' Proposed Findings of Fact (DPFOF) ¶¶ 71–73, ECF No. 19.)

On October 1, 2014, the County issued letters, known as *Garrity* warnings, to Detectives Wudtke, Gamm, and Wright in accordance with Wis. Stat. § 164.02. (ECF Nos. 22-4, 23-3, 25-5.) The Supreme Court's decision in *Garrity v. New Jersey*, 385 U.S. 493 (1967), holds that where a

government employee suspected of misconduct is told failure to answer questions about the alleged misconduct could result in loss of employment, any statement made is considered coerced and cannot be used against him in criminal proceedings. *Id.* at 497–98. The *Garrity* warnings issued by the County instructed the detectives that while they were required to answer questions put to them about their official duties as a condition of their employment, the information they provided could not be used against them in any criminal proceeding. (ECF No. 27-5.) The letter sent by the County also notified the detectives of the nature of the investigation. (*Id.*) Wudtke also received a disciplinary notice from Chief Deputy Gutho of the Sheriff's Office advising him of his right to have a union representative present during the interviews and informing him that the "interview could result in disciplinary action, demotion or dismissal." (ECF No. 27-4.)

Borowski conducted an interview with Wudtke on October 1, 2014 with two union representatives present. At the close of the interview, Borowski asked Wudtke for additional documentation, including Wudtke's recording of the speeches and his conversations at the picnic as well as copies of his Facebook postings. Although Wudtke produced his Facebook posts, he never produced the recordings taken at the picnic because his camera malfunctioned and failed to record the conversations. After receiving the supplemental information, Borowski conducted a follow-up interview with Wudtke on November 8, 2014. Borowski also interviewed Bieber, Amy Dillenburg, DA Parker, Detective Wright, and Detective Gamm as part of his investigation. At the October 22, 2014 County Board of Supervisors open meeting, Borowski presented a status report of his investigation in the form of a PowerPoint presentation. Although Borowski did not name the detectives who were the subject of his investigation, he indicated the investigation regarded "potential deputy misconduct" at the picnic. Several board members believed the investigation was

a "witch hunt" and that any discussions regarding the investigation should be shared in a closed meeting. (Pl.'s Proposed Findings of Fact (PPFOF) ¶¶ 38, 67, ECF No. 31.)

Bieber ultimately won the race for Sheriff of Shawano County and took office on January 5, 2015. On January 9, 2015, Borowski presented his conclusions from his investigation to a joint meeting of the Administrative and Insurance Committee and the Public Safety Committee. Borowski could not find that the detectives committed any violations at the picnic. Based upon his report, the Committee took no further action regarding the picnic investigation and effectively closed the matter. Wudtke never received any discipline from the County or Sheriff's Office regarding his conduct at the picnic. His job duties and responsibilities did not change. Wudtke contends he was never notified as to the results of the picnic investigation, though the defendants assert he learned of the investigation's results through his union representative in February 2015.

On January 21, 2015, the Sheriff's Office held a command staff meeting with Sheriff Bieber, Detective Wudtke, Chief Deputy John Gutho, Captain Thomas Tuma, Detective Sergeant Gordon Kowaleski, and Administrative Coordinator Brent Miller in attendance. The purpose of the meeting was to address confidential information regarding the Coroner's conduct during a death investigation. Wudtke recorded the meeting with a pen-camera to document any instructions he received but did not notify the other participants he would record it. Chief Deputy Gutho and Sergeant Kowaleski noticed the recording device but did not say anything to Wudtke about it during the meeting. On the walk back to their offices after the meeting, Sergeant Kowaleski directed Wudtke to turn the recording device off, and Wudtke complied. Once in his office, Wudtke determined he did not need the recording to clarify his assignments regarding the investigation. He

6

therefore uploaded the file from the pen-camera to his computer and deleted it without reviewing it.

On the same day, Bieber and Chief Deputy Gutho instructed Sergeant Kowaleski to retrieve Wudtke's pen-camera to obtain the recording taken during the meeting. Kowaleski found the recording device inserted in the USB port of Wudtke's county-issued desktop computer. Kowaleski informed Wudtke that he needed to take the pen-camera, and Wudtke responded he did not know if it recorded anything. Gutho instructed Captain Tuma to obtain a written statement from Wudtke about the recording incident. Tuma provided Wudtke with his *Garrity* rights and asked, "why did [he] feel it was necessary to record a meeting with his supervisors?" (DPFOF ¶ 116.) Wudtke prepared a written statement about the recording on January 21, 2015. A forensic examination of the pen-camera revealed that several files had been deleted from it. Wudtke's desktop computer was subsequently confiscated so that it could be subjected to a forensic review. This investigation revealed that the photos and videos taken during the January 21, 2015 command meeting had been downloaded onto Wudtke's computer.

Bieber soon became concerned about Wudtke's trustworthiness, and the County initiated an investigation into the events surrounding the recording incident. Wudtke did not want to be placed on administrative leave during the investigation because he did not want anything negative in his file. The County agreed to refrain from putting Wudtke on administrative leave while it discussed a possible resolution to the recording incident with the union. Union representative Ingram explained to Wudtke that he could either resign from the Sheriff's Office or fight the charges and be investigated. He continued that a finding of just cause termination could affect Wudtke's career as a law enforcement officer. After learning about the grievance procedure and his options, Wudtke

instructed Ingram to reach a resolution with the County that would include his resignation. Wudtke's interview regarding the investigation was delayed several times as a result of the pending resolution.

On March 11, 2015, Ingram advised the County that Wudtke would submit a non-rescindable resignation letter with an end date of employment of June 5, 2015. On March 13, 2015, Wudtke's squad car, duty gear, and weapon were recovered from his home. Wudtke was also locked out of the Sheriff's Office and denied access to his email account. At that point, Wudtke had not yet submitted a letter of resignation. After the County seized his equipment and denied him access to his office, Wudtke unilaterally submitted his resignation on March 19, 2015, effective immediately. On March 21, 2015, Wudtke began a new position with the City of Clintonville.

Wudtke had been looking for alternative work as early as October 2014, when he applied for a position with the Village of Ashwaubenon as a public safety officer. Wudtke had also spoke to the Chief of Police for the Village of Bonduel regarding potential employment. In January 2015, approximately one week after Bieber was sworn in as Sheriff, Wudtke applied for a position as a law enforcement officer with the City of Clintonville.

On June 11, 2015, Bieber revoked the Bonduel Police Department's access cards thereby limiting the Department's access to the Shawano County Sheriff's Office. The City of Bonduel police officers were the only municipal law enforcement officers that were not deputized by Shawano County. On June 29, 2015, Bieber told the Bonduel Village board members that it would "stir a lot of bad feelings with the Sheriff's department" and would be a "big deal" if the Bonduel police department hired an officer the Sheriff's Office no longer trusted part-time. (PPFOF ¶¶ 96–97.) In spite of these warnings, the Bonduel Police Department made an offer of employment to Wudtke

8

on January 4, 2016. Wudtke began working as a part-time officer for the Department on January 24, 2016. Wudtke is presently employed as a full-time public safety officer with the Village of Ashwaubenon Police Department, as well as a part-time officer with the Bonduel Police Department.

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

### II. Wudtke's Motion for Leave to File a Sur-reply

As an initial matter, Wudtke requests leave to file a sur-reply in opposition to the defendants' motion for summary judgment. The defendants oppose the request. "The decision to permit the filing of a sur-reply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." *Meraz–Camacho v. United States*, 417 F. App'x 558, 559 (7th Cir. 2011); *see also Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d

626, 631 n.2 (7th Cir. 2010). Wudtke's sur-reply addresses new arguments and evidence presented by the defendants in their reply brief. Therefore, Wudtke's motion for leave to file a sur-reply is granted.

## III. First Amendment Retaliation Claim

Wudtke claims Bieber and the Committee defendants retaliated against him for exercising his First Amendment right to free speech. Generally, public employees cannot be terminated for engaging in protected speech. *Garcetti v. Ceballos*, 547 U.S. 410, 417, 419 (2006) ("The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens."). To prevail on a First Amendment retaliation claim, a plaintiff must demonstrate that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Novoselsky v. Brown*, 822 F.3d 342, 354 (7th Cir. 2016) (internal citations omitted). The defendants argue Wudtke's speech was not protected under the First Amendment. Alternatively, they argue that even if Wudtke's speech was protected, he did not suffer any adverse employment action as a result of his speech and the speech was not a motivating factor of the defendants' conduct.

## A. Nature of Plaintiff's Speech

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417. "For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3)

his interest in expressing that speech was not outweighed by the state's interest as an employer in promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (internal quotation marks omitted). Wudtke seeks First Amendment protection for his statements made at the Republican Party picnic as well as the comments he made on Facebook.

The defendants argue Wudtke did not speak as a private citizen. They contend that Wudtke's remarks were made pursuant to his official responsibilities and therefore are not protected by the First Amendment. As established in *Garcetti*, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. In analyzing whether speech is made pursuant to the plaintiff's official duties, the court should focus on "the duties an employee is actually expected to perform." *Id.* at 424–25. The controlling inquiry is whether the speech "owes its existence to a public employee's professional responsibilities." *Id.* at 421.

Here, Wudtke's speech was not made in the course of his official duties. His speech at the picnic and his posts on Facebook were made while he was off duty. He attended the picnic wearing street clothes and arrived in his personal vehicle. Moreover, Wudtke's normal job responsibilities did not include campaigning against Bieber. He was not directed to attend the picnic or debate any matters with Bieber. The defendants assert that Wudtke's speech was made as an employee because it impacted his employment. (Defs.' Br. at 13, ECF No. 20.) However, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014); *see also Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 377 & n.3

(7th Cir. 2009). The Supreme Court "has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419. Even though Wudtke knew of Bieber's work experience, the potential purchase of the MRAP, and the events related to the search warrant through his employment as a Shawano County detective, his speech about those topics were not related to his job. Simply put, the fact that Wudtke's employment with the Sheriff's Office did not require him to publically discuss these matters necessitates a finding that his speech was made as a private citizen.

The defendants further assert that the speech at issue was not about a matter of public concern. Speech involves a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011) (citation omitted). Speech that involves a matter of public concern is entitled to First Amendment protection while "speech that addresses 'a private or personal interest'" is not. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 671 (7th Cir. 2009) (quoting *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004)). The court looks to the content, form, and context of a statement to determine whether it rises to the level of public concern. *Connick v. Myers*, 461 U.S. 138, 147–48 & n.7 (1983). Although no factor is singularly dispositive, the Seventh Circuit has found that "the content of the speech is the most important of the three." *Milwaukee Deputy Sheriff's Ass'n*, 574 F.3d at 377 (citing *Chaklos v. Stevens*, 560 F.3d 705, 714 (7th Cir. 2009); *Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 409 (7th Cir. 1994)).

The defendants argue that Wudtke's speech is not protected because his motive for speaking was to challenge Bieber's views and defend the actions of the Sheriff's Office. (Defs.' Br. at 15.)

Although courts should consider the speaker's motive "as part of the 'context' in which the speech was made, . . . speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests." *Chaklos*, 560 F.3d at 714 (emphasis in original). "[T]he fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove the speech from the scope of public concern." *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008). Again, Wudtke raised concerns about Bieber's qualifications, his position on the department's handling of a search warrant, and his position on the purchase of a MRAP. These comments, however, were Wudtke's personal views and did not represent the department's official or unofficial stance on these matters. Whether the Shawano County Sheriff's Office would be "run in an efficient and effective manner is clearly an important matter of public concern." *Wainscott v. Henry*, 315 F.3d 844, 849 (7th Cir. 2003). "Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Anderson v. Celebrezze*, 460 U.S. 780, 802 (1983) (quoting *Williams v. Rhodes*, 393 U.S. 23, 31–32 (1968)). In short, Wudtke's speech at the picnic and on Facebook fit the definition of matters of public concern.

Although Wudtke's statements challenging Bieber's qualifications as Shawano County Sheriff were made as a citizen and addressed a matter of public concern, for his speech to be protected under the First Amendment, it must satisfy the third requirement: "the employee's interest in making the speech must outweigh the employer's interest in 'promoting the efficiency of the public services it performs through its employees.'" *Swetlik*, 738 F.3d at 827 (quoting *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011)). This is known as the *Pickering* balancing test.

*See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). In balancing the parties' interests, courts consider the following factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Bonds v. Milwaukee Cnty.*, 207 F.3d 969, 987 (7th Cir. 2000) (citations omitted). The government must prove that the state's interest as an employer outweighs the interest of the public employee. *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002).

The defendants assert their interest outweigh Wudtke's because they maintained "a strong interest in preserving efficient and harmonious operations of the Sheriff's Office." (Defs.' Br. at 18.) They rely on *Campbell v. Towse*, 99 F.3d 820 (7th Cir. 1996), and *Greer v. Amesqua*, 212 F.3d 358 (7th Cir. 2000), for the proposition that law enforcement agencies have a greater interest in regulating their employees' speech. In *Campbell*, a police officer filed a § 1983 suit after he was suspended with pay for writing a letter to Chief of Police Jones. 99 F.3d at 823. Campbell stated in the letter that he disagreed with Jones' "law enforcement philosophy" and asked to be reassigned to another position within the department. *Id.* at 823–24. Jones sent Campbell a written response reaffirming his stance on community-oriented policing and inquiring as to how Campbell expected to function in any position with the Department if he could not support the program. Jones requested an immediate reply to his concerns. When Campbell did not respond after five days, the Department suspended him with pay. The Seventh Circuit found Campbell's suspension did not violate his First Amendment rights. *Id.* at 829. It reasoned Campbell's letter caused Jones to doubt

his loyalty and Jones recognized the letter "could be indicative of insubordination," as Campbell had been less than diligent in completing a grant application to fund the community-policing program. *Id.* "Campbell's interest in expressing himself as he did was thus decisively outweighed by Jones' interest in maintaining control over the Department and preserving departmental discipline and cohesion." *Id.* at 830.

Likewise, in *Greer*, a firefighter brought a § 1983 action against the fire chief, fire department, and city after he was terminated for publishing a news release accusing the chief of favoritism. 212 F.3d at 362. The Department felt that Greer's speech, if left unpunished, would disrupt the Department's operation by "degrading the Department's standing with the public, undermining [the Chief's] authority and inciting disharmony within Department ranks." *Id.* at 372. The court concluded the Department's actions were reasonable, observing that Greer should have "followed authorized procedures, appealed to more appropriate authorities, or perhaps shown a wilful lack of investigation on the part of [his] supervisors." *Id.* (quoting *Wright v. Ill. Dept. of Children & Family Servs.*, 40 F.3d 1492, 1504 (7th Cir. 1994)) (alterations in original). "The publicity and sensationalism of Greer's news release belied the fact that it imparted little new information about the . . . incident to the public discourse other than Greer's unsubstantiated suspicions." *Id.* The court found the Department's interest in efficiency and morale outweighed Greer's First Amendment interests. *Id.*

These cases are distinguishable from the case at hand, however, because they involve statements made by employees fundamentally challenging their department's current policies or supervisors and causing a disruption to the department and the employee's work. In this case, Wudtke addressed topics that were the subject of public concern at a forum held for that purpose.

While these topics related to the Sheriff's Office, the defendants have not shown that Wudtke's communications either impeded his work or interfered with his relationship with his co-workers. Moreover, these comments were made before Bieber became sheriff. The defendants have not demonstrated that once Bieber became sheriff, Wudtke's political speech was disruptive to his responsibilities or the Office's regular operations. The defendants' general interest in controlling employee speech to prevent the potential for creating disharmonious working relationships does not outweigh Wudtke's First Amendment interests. In sum, Wudtke's speech is constitutionally protected.

## B. Sufficiently Adverse Action

Having determined Wudtke engaged in constitutionally-protected speech, the court must determine whether Wudtke suffered a deprivation that would likely deter First Amendment activity in the future. The employment action must be "sufficiently adverse" to deter a plaintiff's exercise of his First Amendment rights. *See Power v. Summers*, 226 F.3d 815, 820–21 (7th Cir. 2000). Wudtke identifies a number of the defendants' actions he believes present an actual or potential danger of deterring his exercise of free speech. These actions can be separated into two categories: the Committee defendants' conduct and Bieber's conduct. As to the Committee defendants, Wudtke asserts their investigation into his picnic-related activity without reason or cause as well as their notice of the investigation through a letter containing his *Garrity* rights constitute sufficiently adverse conduct. Wudtke claims Bieber engaged in a series of petty harassment by seizing his computer; confiscating his squad car and all of his duty gear, weapons and equipment; locking him out of his office and email; and ultimately forcing him to resign from his employment as deputy sheriff. He asserts that Bieber also threatened his career in law enforcement by denying the Bonduel Police

Department access to the Sheriff's Office and warning the Bonduel Police Department it would be a "big deal" and create "bad feelings" if it hired Wudtke part-time. Applying these standards, the court will address each the defendants' actions in turn.

## 1. Committee Defendants' Conduct

Wudtke claims that the picnic investigation and the issuance of a letter containing his *Garrity* warnings regarding the investigation constitute adverse actions. The court concludes that neither the investigation nor the letter were "sufficiently adverse" to chill Wudtke's exercise of his First Amendment rights.

As an initial matter, the court notes that Wudtke's speech was not the focus of the picnic investigation. Detectives Wright and Gamm were also subject to the investigation, and they had not engaged in any protected speech. In early October 2014, Wudtke, Wright, and Gamm received notice of the investigation and their impending interviews. The letter explained the purpose of the investigation was to:

> investigate [their] conduct before, during and after the July 22, 2014 picnic at the St. James retreat, [their] possible use of county time and resources for matters unrelated to county business or county law enforcement activities and [their] possible use of social and/or electronic media in a manner which is inconsistent with, or in violation of, county policy.

(ECF Nos. 22-4, 23-3, 25-5.) In short, being one of multiple individuals subject to an investigation and receiving a notice detailing the scope of said investigation would not deter a reasonable public employee from engaging in protected speech.

Wudtke asserts that the Committee defendants initiated the investigation in violation of County policy and Wisconsin Statute Chapter 164, which prohibits retaliation against an officer for exercising his right to engage in off-duty political activity. As the Management and Administrative

17

Manual illustrates, however, the Committee has a general duty to investigate potential severe misconduct. (ECF No. 24-7 at 30.) Indeed, the items identified as the points of concern for the picnic investigation would constitute severe misconduct. Although the Committee defendants did not have the authority to discipline the detectives, they had a responsibility to look into any potential violations the detectives' conduct may have caused. At the conclusion of the investigation, the Committee defendants did not believe any disciplinary measures were necessary. On January 9, 2015, Borowski presented his findings to a joint meeting of the Administrative and Insurance Committee and the Public Safety Committee. Borowski could not find that the detectives committed any violations at the picnic. As a result, the Committee defendants took no further action regarding the picnic investigation and effectively closed the matter. Although the Supreme Court and the Seventh Circuit have not addressed the issue, this court agrees with the other courts that have found that an internal investigation alone generally does not constitute an adverse employment action under the First Amendment. *See Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1228–29 (10th Cir. 2009); *Altonen v. City of Minneapolis*, 487 F.3d 554, 560 (8th Cir. 2007); *Pierce v. Tex. Dept. of Criminal Justice, Inst. Div.*, 37 F.3d 1146, 1150 (5th Cir. 1994); *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000); *Lakkis v. Lahovski*, 994 F. Supp. 2d 624, 633 (M.D. Penn. 2014). In short, the court finds that the Committee defendants' conduct does not constitute adverse employment actions. As such, Wudtke has failed to establish a prima facie case of retaliation against them.

Even if Wudtke had established a prima facie case of retaliation, the Committee defendants are entitled to absolute immunity. "Absolute immunity is available to members of quasi-judicial adjudicatory bodies when they perform duties that are functionally comparable to those of a judicial

officer." *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 521 (7th Cir. 2001) (citing *Butz v. Economou*, 438 U.S. 478, 512–13 (1978)). The Committee defendants argue they are entitled to absolute immunity because they acted in a quasi-judicial capacity by initiating an investigation against the detectives. They contend they acted in accordance with the Shawano County Board of Supervisor Rules and the Management and Administrative Manual which allow them to "receive complaints, questions and problems, and evaluate and solve such matters." (Defs.' Br. at 6.) Indeed, the Committee defendants have the characteristics that counsel toward granting absolute immunity—they made a decision to call for an investigation of the conduct of the detectives and subsequently decided to close the matter.

The Seventh Circuit has applied absolute immunity under federal law to review boards wielding quasi-judicial authority similar to that of the Committee defendants. For instance, in *Heyde v. Pittenger*, the trustee of certain residential property brought a § 1983 suit against Tazewell County Board of Review members, asserting that the Board set his property's assessment at levels "grossly disproportionate" to its fair market value. 633 F.3d 512, 514 (7th Cir. 2011). The court began its quasi-judicial analysis by examining the Board's functions. It found that the Board members had the authority to resolve complaints challenging assessments and revise any property assessments. The court concluded that even though the Board investigated and gathered evidence to provide a rationale for its ruling regarding the assessment, the members acted in quasi-judicial capacities as the ultimate fact-finders and decision-makers to resolve the trustee's complaint. *Id.* at 518. As such, the court held that the Board members were absolutely immune from suit. *Id.* at 519; *see also Capra v. Cook Cnty. Bd. of Review*, 733 F.3d 705, 710 (7th Cir. 2013) (absolute immunity for county board review members with the authority to review property tax appeals); *Tobin for Governor*, 268 F.3d

19

at 522–23 (absolute immunity for election board members tasked with hearing and determining the validity of nomination petitions of candidates for State offices); *Wilson v. Kelkhoff*, 86 F.3d 1438, 1444 (7th Cir. 1996) (absolute immunity for parole board members who "grant, deny, or revoke parole").

Moreover, the Committee defendants should be free from coercion in assessing whether to initiate an investigation against a county employee for engaging in alleged misconduct. After the Committee defendants received complaints that they believed involved potential misconduct on behalf of the detectives, they voted to initiate an investigation to scrutinize the detectives' conduct before, during, and after the picnic and determine whether they used county time and resources for matters unrelated to county business or county law enforcement activities and whether they used electronic media in a manner which is inconsistent with, or in violation of, county policy. (ECF No. 22-4.) After Borowski concluded the detectives did not violate any county policies, the Committee defendants closed the matter. The doctrine of absolute immunity promotes the importance of an independent and impartial exercise of judgment by a decision-maker. *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435 (1993). "[T]he cloak of immunity is designed to prevent a situation in which decision makers 'act with an excess of caution or otherwise . . . skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct,' out of fear of litigation or personal monetary liability." *Tobin for Governor*, 268 F.3d at 522 (quoting *Forrester v. White*, 484 U.S. 219, 223 (1988)). In short, absolute immunity should be extended to committee members tasked with quasi-judicial functions to protect them from "harassment and intimidation so that they can exercise their independent judgment." *Id.*

20

Wudtke asserts that the Committee defendants acted outside the scope of their adjudicative capacity by initiating an investigation against the detectives. He argues that pursuant to the County's collective bargaining agreement with the Wisconsin Professional Police Association and Wis. Stat. § 59.26(8), only the sheriff or his designee can recommend disciplinary action in matters involving deputy sheriffs. However, § 59.26(8) does not restrict all county committees from simply initiating an investigation into a deputy sheriff's conduct. Further, the actual conduct or alleged wrongdoing of an individual acting in a quasi-judicial capacity "does not temper the protection of absolute immunity." *Capra*, 733 F.3d at 710 (citation omitted). Officials acting in a quasi-judicial capacity are entitled to absolute immunity "even when they act in error, maliciously, or in excess of their authority." *Tobin for Governor*, 268 F.3d at 524. As such, even if the Committee defendants acted in excess of their authority by initiating the picnic investigation, they are entitled to absolute immunity. In sum, summary judgment will be granted as to the Committee defendants.

## 2. Bieber's Conduct

Wudtke asserts Bieber orchestrated a campaign of petty harassment against him. Bieber claims that even if Wudtke's speech is constitutionally protected, he has failed to show that any adverse job action occurred. Yet, a § 1983 retaliation claim "does not require an adverse employment action within the same meaning as other anti-discrimination statutes." *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011) (citing *Spiegla*, 371 F.3d at 941; *Power*, 226 F.3d at 820). Instead, the plaintiff must demonstrate that the employer's action is "sufficiently adverse" to deter the exercise of his First Amendment rights. *Power*, 226 F.3d at 820–21. The Seventh Circuit has articulated that a "campaign of petty harassment," including minor forms of retaliation, diminished responsibility, or false accusations is actionable under the First Amendment. *Id.* at 821 (quoting

*DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 87, 192 (7th Cir. 1995)). "Harassment of a public employee for his political beliefs violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs." *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982); *Rode v. Dellarciprete*, 845 F.2d 1195, 1205 (3d Cir. 1988)). This is a relatively low standard—even something as superficial as "making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday" has been found to chill an employee's exercise of his First Amendment rights. *Power*, 226 F.3d at 820 (citing *Bart*, 677 F.2d at 624). Applying these standards, the court concludes Wudtke has provided enough evidence establishing that Bieber engaged in adverse conduct against him.

Less than two weeks after the Committee closed its investigation, Bieber initiated another investigation against Wudtke, this time for failing to request permission to record a January 21, 2015 command meeting. Wudtke's pen-camera was confiscated on January 21, 2015. On the same day, Tuma provided Wudtke his *Garrity* rights and instructed him to provide a written statement as to why he recorded the meeting with his supervisors. Wudtke's desktop computer was subsequently confiscated to conduct a forensic investigation to obtain the recordings. Bieber asserts that Wudtke had access to other departmental computers and could have obtained additional documents through Sergeant Kowaleski, though Wudtke contends he could not effectively carry out his duties without his computer and disputes that his files were available through Kowaleski.

As a result of the pending investigation surrounding the recording incident, the union attempted to resolve the dispute with the County. On March 11, 2015, union representative Ingram advised the County that Wudtke would submit a non-rescindable resignation letter ending Wudtke's

employment with the Sheriff's Office on June 5, 2015. On March 13, 2015, Bieber directed Kowaleski and Tuma to remove Wudtke's squad car, duty gear, badge, and weapon from Wudtke's home. The Sheriff's Office also denied Wudtke access to his office and email account. At this time, Wudtke was still employed by Shawano County as he had not yet submitted a letter of resignation to the County and was not placed on administrative leave. After the County seized his equipment, Wudtke submitted a letter of resignation on March 19, 2015, effective immediately.

On June 11, 2015, Bieber limited the Bonduel Police Department's access to the Sheriff's Office. He also spoke at a meeting with Bonduel Village President Sharon Wussow and Village board members on June 29, 2015, warning them that it would "stir a lot of bad feelings with the Sheriff's department" and would be a "big issue" if the Bonduel Police Department hired Wudtke part-time. (PPFOF ¶ 96.) Bieber also explained that the Sheriff's Office had "just let [Wudtke] go, basically. He resigned—but he was let go," and "it would be a big deal if that deputy, who we no longer trust, was now hired by another department." (*Id.* ¶ 97.)

Taken together, Wudtke has met the low standard to establish that Bieber's conduct amounts to a series of petty harassment. In sum, Wudtke has produced enough evidence upon which a jury could conclude that Bieber's conduct was sufficiently adverse to deter the exercise of his First Amendment rights.

## C. Causation

Finally, the court must determine whether Wudtke's speech motivated Bieber's decision to take adverse action against him. At the summary judgment stage in a retaliation case, the burden of proof on causation is "split between the parties." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). To establish a prima facie case of retaliation, "the plaintiff must produce evidence that his

speech was at least a motivating factor—or, in philosophical terms, a 'sufficient condition'—of the employer's decision to take retaliatory action against him." *Id.* "A 'motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions.'" *Mullin v. Gettinger*, 450 F.3d 280, 284 (7th Cir. 2006) (quoting *Spiegla*, 371 F.3d at 942).

Once the plaintiff establishes a prima facie case of First Amendment retaliation, the burden shifts to the employer to "rebut the causal inference raised by the plaintiff's evidence." *Id.* If the employer is able to make this showing, "the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012) (citing *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011)). "Pretext is more than a mistake on the part of the employer; it is a phoney excuse." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). At the summary judgment stage, the plaintiff must produce evidence "upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Zellner*, 369 F.3d at 379.

Wudtke points to numerous events that would allow a reasonable fact finder to infer that Bieber's actions were taken because of his protected speech. Based upon the timing of events in this case as discussed above, the court concludes Wudtke has demonstrated that his speech was the motivating factor for Bieber's adverse actions. As such, he has made a prima facie case for retaliation.

Bieber argues that some of his acts, specifically the seizure of Wudtke's computer, the retrieval of his equipment, his resignation, and Bieber's statements to the Bonduel board members, were unrelated to Wudtke's speech and taken in direct response to his recording of the January 21,

2015 command staff meeting and subsequently lying about his conduct to his superior officers. (Defs.' Br. at 14.) Bieber also asserts that Wudtke has failed to establish a causal connection between his speech and Bieber's acts because the conduct occurred six months after the picnic. Indeed, "the fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation." *Mullin*, 450 F.3d at 285. Nevertheless, the court finds that Wudtke has presented sufficient evidence to dispute Bieber's proffered reason for the adverse conduct.

Wudtke asserts that as his conversation at the picnic with Bieber came to an end, Bieber said something to the effect of "I'll take care of this after the twelfth," which Wudtke interpreted as a reference to the August 12, 2014 primary election. Approximately two weeks after Bieber won the primary election, he had dinner with Bonduel Police Chief Todd Chaney and Shawano Police Chief Mark Kohl on August 21, 2014. (PPFOF ¶ 32.) Chaney testified that at the dinner, Bieber indicated the first thing he would do as Sheriff "is get rid of" Wudtke, explaining that "he leads the corruption at the sheriff's department." (*Id.*) Bieber and Kohl both deny that Bieber made this statement. Shortly after Bieber became Sheriff, he told Chief Deputy Gutho numerous times that "Wade's gotta go." (*Id.* ¶ 71.) Wudtke contends that as a result of Bieber's desire to terminate his employment, Bieber manufactured concern about the January 21, 2015 recording incident to get rid of him, twelve days after the Committee closed its picnic investigation and found the detectives did not commit any violations. Wudtke asserts that Bieber's behavior gives rise to an inference of pretext and Bieber's retaliatory motives. (Pl.'s Br. in Opp. at 29, ECF No. 32.)

"The persuasiveness of an employer's non-retaliatory explanation ordinarily is 'for the finder of fact to assess.'" *Massey v. Johnson*, 457 F.3d 711, 719 (7th Cir. 2006) (quoting *Venters v. City*

*of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997)). A court should only grant summary judgment when "the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Venters*, 123 F.3d at 973. Viewing the facts in the light most favorable to the non-moving party, the court concludes that a jury could reasonably find that Wudtke's speech was a motivating factor for Bieber's adverse actions and that Bieber's stated reasons for his actions are mere pretext. Accordingly, the defendants' motion for summary judgment will be denied regarding Wudtke's First Amendment retaliation claim against Bieber.

## IV. Immunity

Having determined that triable issues of fact preclude summary judgment regarding Wudtke's § 1983 claim against Bieber, the court turns to Bieber's contention that he is protected by either qualified immunity or the political patronage exception. Bieber asserts he is entitled to qualified immunity because it is unclear whether the specific actions he took against Wudtke could be considered unconstitutional. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). To be clearly established, "a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). A defendant's "actual state of mind or knowledge of the law is irrelevant to whether the asserted conduct would have been legally reasonable." *Armstrong v. Daily*, 786 F.3d 529, 538 (7th Cir. 2015).

In this case, it is clearly established in the Seventh Circuit that a government official cannot engage in any acts of harassment in retaliation for an employee's exercise of his First Amendment

rights. Beginning as early as 1982, the Seventh Circuit held that a campaign of petty harassment in response to an employee's expression of his political views is actionable under § 1983 as a violation of the employee's First Amendment rights. *Bart*, 677 F.2d at 625; *see also Power*, 226 F.3d at 820 (a campaign of petty harassment is actionable under the First Amendment); *Pieczynski*, 875 F.2d at 1333 (harassing public employee for his political beliefs violates the First Amendment unless the harassment is trivial); *Warner v. City of Terre Haute, Ind.*, 30 F. Supp. 2d 1107, 1127 (S.D. Ind. 1998) (defendant did not enjoy qualified immunity because campaign of petty harassment against employee constituted "clearly established" constitutional violation). Based on this clearly established case law, a public official could not have reasonably believed that he was free to retaliate against Wudtke by engaging in a campaign of petty harassment, including seizing his computer; confiscating his squad car, duty gear, weapons, and equipment before he resigned from the department; denying him access to his office and email before resigning; and interfering with his employment opportunities with the Bonduel Police Department. In short, the defense of qualified immunity must fail as applied to Bieber.

Alternatively, Bieber argues he cannot be liable for his actions under the political patronage exception. The Seventh Circuit has recognized that county sheriffs in small jurisdictions do not violate the First Amendment when they "dismiss or demote a politically disloyal deputy." *Wallace v. Benware*, 67 F.3d 655, 661 (7th Cir. 1995); *see also Heidman v. Wirsing*, 7 F.3d 659 (7th Cir. 1993) (holding that there was no First Amendment violation in discharging deputy sheriff for supporting sheriff's opponent in sheriff's race). This is so because a county sheriff "is entitled to insist on the loyalty of his policymaking subordinates." *Wilbur v. Mahan*, 3 F.3d 214, 218–19 (7th Cir. 1993); *see also Upton v. Thompson*, 930 F.2d 1209, 1218 (7th Cir. 1991) (finding that sheriff's

deputies are policymaking employees because they "operate with a sufficient level of autonomy and discretionary authority"). However, the Seventh Circuit has also established that the sheriff's ability to dismiss or demote politically disloyal deputies does not extend to the sheriff's campaign of retaliatory harassment. *Wallace*, 67 F.3d at 662.

As applied to this case, it is evident Bieber's conduct does not fit within the political patronage exception. Although Bieber could terminate or demote Wudtke for supporting his opponent in the election, he is not entitled to undertake a campaign of petty harassment against Wudtke that included seizing Wudtke's computer; retrieving his squad car, duty gear, and weapon and denying him access to his office and email before submitting his resignation; and warning the Bonduel board members that it would be a "big issue" if the police department hired Wudtke part-time. *See id.* at 662–63. An argument can be made that it is logically inconsistent to say that, on the one hand, an employer can terminate an employee because his conduct is not constitutionally protected while at the same time holding that petty harassment motivated by the same conduct is prohibited. To be sure, petty harassment is not to be encouraged. But the Constitution does not provide the only remedy for public employees wronged by their employer. Nevertheless, Seventh Circuit precedent on this issue is clear: a sheriff cannot retaliate against a deputy sheriff for engaging in protected speech with a campaign of petty harassment. Accordingly, the political patronage exception does not shield Bieber from liability for his conduct.

## V. Wisconsin Law Enforcement Officers' Bill of Rights

Wudtke also asserts state law claims against all of the defendants. He claims the defendants violated the Wisconsin Law Enforcement Officers' Bill of Rights, specifically Wis. Stat. §§ 164.015 and 164.03. Section 164.015, entitled "Engaging in political activity," provides:

28

No law enforcement officer may be prohibited from engaging in political activity when not on duty or not otherwise acting in an official capacity, or be denied the right to refrain from engaging in political activity.

Section 164.03, entitled "Recrimination," states:

No law enforcement officer may be discharged, disciplined, demoted or denied promotion, transfer or reassignment, or otherwise discriminated against in regard to employment, or threatened with any such treatment, by reason of the exercise of the rights under this chapter.

The defendants argue that the Wisconsin Law Enforcement Officers' Bill of Rights does not create a private right of action. An implied right of action does not arise under Wisconsin law unless "(1) the language or the form of the statute evinces the legislature's intent to create a private right of action, and (2) the statute establishes private civil liberty rather than merely providing for protection of the public." *Grube v. Daun*, 210 Wis. 2d 681, 689, 563 N.W.2d 523 (1997). Here, the language and form of Wis. Stat. §§ 164.015 and 164.03 do not suggest that the Wisconsin legislature intended to create a private right of action for individuals affected by a violation of these statutes. The Bill of Rights as a whole is devoid of any language creating a private right of action and does not contain any remedial provisions. In short, the court finds no clear indication of a legislative intent in Chapter 164 to create a private right of action. As such, the defendants' motion for summary judgment as to Wudtke's state law claims is granted.

## CONCLUSION

Based upon the foregoing analysis, the defendants' motion for summary judgment (ECF No. 16) is **GRANTED-IN-PART AND DENIED-IN-PART**. Wudtke's state law claims against all of the defendants are dismissed. Wudtke's § 1983 claim is dismissed as to Noffke, Erdmann, Olson,

Hoppe, and Switalla but remains pending against Bieber.  Wudtke's motion for leave to file a sur-

reply (ECF No. 39) is **GRANTED**.

      **SO ORDERED** this  _23rd_  day of May, 2017.

                       s/ William C. Griesbach
                       William C. Griesbach, Chief Judge
                       United States District Court